**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **VLSI TECHNOLOGY,** | § | |
| *Plaintiff*, | § | |
| | § | **CIVIL ACTION 6:21-cv-00299-ADA** |
| **v.** | § | |
| | § | |
| **INTEL CORPORATION,** | § | |
| *Defendant*. | § | |
| | § | |

## ORDER DENYING VLSI'S RULES 59 AND 60(b)(3) MOTION FOR A NEW TRIAL

### I.    INTRODUCTION

Before the Court is Plaintiff VLSI Technology's ("VLSI") Motion for a New Trial, Defendant Intel Corporation's ("Intel") Opposition Brief, and VLSI's Reply Brief. ECF No. 597; ECF No. 609; ECF No. 619. VLSI filed this Motion for a New Trial under Federal Rules of Civil Procedure 59 and 60(b)(3). VLSI's request is grounded on four main theories of prejudicial conduct or misconduct, which allegedly tainted the reliability of the jury's verdict: (i) The Court erred in denying Plaintiff's request for a jury instruction, which included the Court's language during the *Markman* hearing; (ii) Intel asked the jury to apply incorrect claim constructions for four different claims at issue; (iii) Intel withheld information during discovery and used such information to prejudicially undermine VLSI's expert witness; and (iv) Intel's closing arguments violated some of the Court's *in limine* rulings and prejudiced the jury. After considering the parties' briefing, the relevant facts, and applicable law, the Court **DENIES** VLSI's Motion.

### II.    LEGAL STANDARD

After a jury trial, a district court may grant a motion for a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P.

59(a)(1)(A). Rule 59 "does not specify what grounds are necessary to support such a decision," but it "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict." *Smith v. Transworld Drilling Co*., 773 F.2d 610, 612–13 (5th Cir. 1985). For example, should the Court find "the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course," a new trial may be granted. *Id.* at 613. In appraising such motions, district courts must "weigh[] all the evidence, but need not view it in the light most favorable to the nonmoving party." *Id.* A Rule 59 motion will be denied "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 417 (5th Cir. 2020) (citation omitted).

Federal Rule of Civil Procedure 60(b)(3) states relief from a final judgment may be granted if the record demonstrates "fraud . . . misrepresentation, or misconduct by an opposing party." FED. R. CIV. P. 60(b)(3). Parties who motion for relief under Rule 60(b)(3) have "a heavy burden" and must "show by clear and convincing evidence" that the opposing party "engaged in misrepresentation that prevented [them] from fully and fairly presenting their case." *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig*., 888 F.3d 753, 790 (5th Cir. 2018) (citation omitted). Rule 60(b)(3) "applies to misconduct in withholding information called for by discovery." *Rozier v. Ford Motor Co*., 573 F.2d 1332, 1339 (5th Cir. 1978). However, Rule 60(b)(3) "does not require that the information withheld be such that it can alter the outcome of the case." *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 641 (5th Cir. 2005) (citation omitted). The rule intends to provide relief for "judgements which were unfairly obtained, not [] those which are factually incorrect." *Rozier*, 573 F.2d at 1339.

### III.    DISCUSSION

**A.  The '522 Patent**

**1.  Claim construction of "regulate/regulating at least one supply from a power source and an inductance" term**

As described in more detail below, because the basis of VLSI's motion is related to claim construction and because the Court did not have an opportunity to enter a memorandum in support of its claim construction order prior to the start of expert discovery, the Court now takes this opportunity to provide a more fulsome explanation of the Court's reasoning.

**a.  Description of the '522 Patent and types of voltage regulators**

United States Patent No. 6,366,522 (the "'522 Patent") is directed to "controlling power consumption of an integrated circuit includ[ing] processing that begins by . . . producing a system clock control signal" and "the power supply control signal based on a processing transfer characteristic of a computational engine and processing requirements associated with processing at least a portion of an application by the computational engine."  '522 Patent at Abstract.  One application of the '522 Patent is to support dynamic voltage and frequency scaling ("DVFS") in microprocessors, SoCs, and other chips.  *Id.* at 1:45–48.  By way of background, DVFS is a technique that dynamically decreases the clock frequency and the supply voltage when the performance requirements of a particular application do not require the highest clock frequency and supply voltage in order to reduce the power consumption.  But when an application requires needs a higher clock frequency and/or supply voltage, DVFS increases the frequency and voltage appropriately.

The switching power of a transistor can be calculated as follows:

$$P = \alpha * f_{CLK} * C * V^2$$

wherein $\alpha$ is the activity factor (*i.e.*, how often the transistor switches), $f_{CLK}$ is the clock frequency, C is the output capacitance that the transistor is charging, and V is the supply voltage.[1]  Based on this formula, reducing the clock frequency $f_{CLK}$ linearly reduces the switching power, while reducing the supply voltage V quadratically reduces the switching power.

Figure 1 illustrates a block diagram of the in accordance with the present invention.  *Id.* at 1:51–52.



FIG. 1

Phase lock loop 16, in response to system clock control signal 44 from computational engine 12, changes the frequency of system clock 42 based on the computational needs of the particular application.  *Id.* at 2:58–67.  On-chip power supply 20, in response to power supply control signal from computational engine 12, changes the voltage supply 58.  *Id.* at 3:15–17.

---

[1] The switching power of the chip is simply the sum of the switching power of all transistors in the chip.

Intel contends that there are only two types of voltage regulators—buck voltage regulators and boost voltage regulators (also referred to as buck converters and boost converters herein). ECF No. 89 at 1. Intel contends—and VLSI does not appear to disagree—that a boost regulator uses an inductance as part of its input while a buck regulator uses an inductance as part of its output. ECF No. 82 at 2; *see also* ECF No. 85 at 1–7; ECF No. 90 at 1–3. Intel provides an example of each type of voltage regulator in its Opening brief:





ECF No. 82 at 2.

In both figures, the input voltage is 2V. In the boost voltage regulator (labeled as "boost converter"), the input voltage of input voltage of 2V is "boosted" to an output voltage of 3V. By

5

contrast, in the buck voltage regulator (labeled as "buck converter") reduces the input voltage from 2V to an output voltage of 1V.

Intel contends that in a <u>boost</u> voltage regulator, the voltage induced by the inductor (shaded in red) is added to the input voltage (shaded in green), and that the combined voltage is regulated by the regulating circuitry (shaded in blue) and output across the resistor with an output voltage V. ECF No. 82 at 2. Based on that, Intel contends that the inductor is part of the <u>input</u>. *Id.* Intel contends that in a buck voltage regulator, the regulating circuit (again shaded in blue) reduces the input voltage (again shaded in green) and that the inductor (again shaded in red) smooths out the output to a fixed level. *Id.* Intel contends that the buck voltage regulator uses the inductor as part of its output. *Id.*

### b. The parties' claim construction positions

Intel contends that the patentee made a clear an unmistakable disavowal during a reexamination. ECF No. 89 at 1. In particular, Intel contends that the patentee disclaimed buck voltage regulators during reexamination, and thus the claimed invention covers boost voltage regulators only. ECF No. 82 at 3. Intel contends its proposed construction simply reflects the patentee's choice of disclaiming buck voltage regulators and limiting the claim scope to boost voltage regulators. *Id.*

Intel contends that during reexamination, the Examiner rejected the claims in light of eight prior art references (Dancy, Wei, Min, Goodman, Burd I, Burd II, Gutnik I, and Gutnik II,), each of which disclosed a buck converter "in which the regulating circuity (in blue) receives an input voltage from a power supply (in green), and an inductor (in red) smooths the regulated output received from the regulating circuitry." *Id.* at 3–4. Intel contends that the patentee argued that the '522 claims "require an inductance ***connected*** to a power source and ***positioned between*** the power

6

source and regulating circuitry" and that Figure 1 depicts regulating voltage "from power source 62 (e.g., battery) **and** inductance 60." *Id.* at 4 (emphasis in original).

The Wei reference disclosed the following buck converter. *Id.* at 4–5 (citing *id.*, Ex. DX-11 at 26) (annotations added by Intel).



Intel contends that the patentee argued that Wei did not disclose "to regulate at least one supply from a power source and an inductance based on a power supply control signal" in Claim 1 of the '522 Patent because "Wei's inductance ***is not connected to a power source*** and Wei does not disclose regulating CVdd 'from a power source and an inductance.'" *Id.* at 5 (quoting *id.*, Ex DX-11 at 26) (emphasis in original).

The Min reference disclosed the following buck regulator. *Id.* at 5 (citing *id.*, Ex. DX-11 at 23) (annotations added by Intel).



**Figure 3.** Simplified schematic for the buck regulator.

Intel contends that the patentee argued that Min did not disclose "to regulate at least one supply from a power source and an inductance based on a power supply control signal" in Claim 1 of the '522 Patent because "Min's inductance *is not connected to a power source* and Min does not disclose regulating $V_{out}$ 'from a power source and an inductance.'" *Id.* at 6 (quoting *id.*, Ex. DX-11 at 22) (emphasis in original).

The Dancy reference disclosed the following down converter, *i.e.*, buck voltage regulator. *Id.* at 6 (citing *id.*, Ex. DX-11 at 16) (annotations added by Intel).



**Figure 10:** Standard Down Converter Topology.

Intel contends that the patentee argued that Dancy did not disclose "to regulate at least one supply from a power source and an inductance based on a power supply control signal" in Claim 1 of the

'522 Patent because the "power supply control signal operates *switches S1 and S2 from the power source ($V_{in}$) alone*, not from the power source and the inductance." *Id.* at 6 (quoting *id.*, Ex. DX-11 at 16) (emphasis in original).

With respect to the other five prior art references (Burd I, Burd II, Goodman, Gutnik I, and Gutnik II), Intel generally contends that the "patentee similarly distinguished the five other cited prior art references because the inductances in the disclosed buck regulators appeared *after* the regulating circuitry, and thus were *not connected* to the power source and *did not sit* between the power source and regulating circuitry." *Id.* at 6. More specifically, Intel contends that the patentee distinguished Burd I and Burd II because both use an "external LC filter in a synchronous buck configuration." *Id.* at 6. Intel contends that the patentee distinguished the buck configuration in Goodman "because the inductance in the external LC filter' is *not connected to a power source*." *Id.* at 6 (internal quotation marks omitted). Intel further contends that the patentee distinguished Gutnik I "because the inductance is in 'a buck converter' configuration." *Id.* at 6. Intel finally contends that the patentee distinguished Gutnik II because it "uses the LC filter in a buck configuration." *Id.* at 6–7.

Intel concludes by contending that these "representations make clear that the '522 claims require a boost regulator configuration in which the 'inductance' is connected to the power source and sits between the power source and the regulating circuitry" and that the patentee is held to those representations. *Id.* at 7 (citing *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1376 (Fed. Cir. 2008); *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1266 (Fed. Cir. 2012)).

In its response, VLSI first contends that Intel's argument is based on the oversimplification that there are only two categories of voltage regulators—boost and buck—but rather that there are voltage regulators that use or do not use inductors, and voltage regulators that are a combination

of boost and buck voltage regulators. ECF No. 85 at 1–2 (citing VLSI's Expert's Resp. at ¶¶ 8–13 and '522 Patent at 6:53–55).

VLSI next contends that the "claims do not restrict how [power source, inductance, etc.] are connected, in what order, or any other circuit arrangement specifics, appropriately leaving those implementation details to the designer." *Id.* at 2. VLSI also contends that because other claims, *e.g.*, Claim 25, recite that the inductance is an "external" inductance, the patentee never intended to limit the location of the inductance.

VLSI contends that the specification expressly recites that "a buck converter may be [used] instead of a boost converter." *Id.* at 2.

With respect to Intel's reexamination disclaimer argument, VLSI contends that the patentee's reexamination statements fall well short of the "clear and unmistakable disavowal" standard required for disclaimer. *Id.* at 3. VLSI contends that the patentee's statements distinguished prior art for failing to disclose a "on-chip power supply control module," but did not disclaim claim scope. *Id.* Rather, at least according to VLSI, the patentee's statements "lack the clarity needed to define the claims for all purposes in direct contradiction of the specification." *Id.* With respect to the Dancy reference, VLSI contends that the patentee's statement ("because the power supply control signal operates switches S1 and S2 from the power source ($V_{in}$) alone") is directed to the voltage regulator's <u>control signal</u> and does not justify Intel's addition of "where the inductance is positioned between the power source and the regulating circuitry" to its proposed construction. *Id.* With respect to the Wei, Min, Goodman, and Gutnik I references, VLSI contends that the patentee's statements were nearly identical and "simply describe the circuit and then conclude, with no explanation, that it 'would not result in the claimed invention,'" and, as such, there is no clear disavowal. *Id.* at 3–4. With respect to the Gutnik II reference, VLSI contends

that the patentee's statement introduced "additional ambiguities." *Id.* at 4. In particular, VLSI contends that the patentee's statement ("Gutnik II's DC/DC converter uses the LC filter in a buck configuration, but doesn't regulate a supply voltage 'from an inductance and a power source.'"), which used the word "but," implied that "a buck converter actually could (and was expected to) fall within this claim scope." *Id.* (quoting ECF No, 82, Ex. DX-11 at 44).

In addition to lacking the required clarity needed for a disclaimer and introducing additional ambiguity, VLSI contends that the patentee's reexamination statements are "'amendable to multiple reasonable interpretations.'" *Id.* (quoting *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1359 (Fed. Cir. 2003)). In particular, VLSI points to the patentee's statements with respect to Dancy and Gutnik II as being amendable to multiple, reasonable interpretations. *Id.* at 4–5.

VLSI contends that "the patentee's statements do not clearly and unmistakably exclude all circuit arrangements in which the inductance is not both connected to the power source and located between the power source and the regulating circuitry." *Id.* at 5 (analogizing to *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040 (Fed. Cir. 2016)).

VLSI further contends that Intel "cannot prove that the [reexamination] history somehow eliminates all circuits other than the single circuit layout Intel identifies." *Id.* at 5. In support of its argument, VLSI contends that "[a]t no point during the reexamination did the patentee declare that the inductance must be connected to the power source in this precise arrangement" and that "many [circuit] arrangements fall within the claims' plain meaning and are consistent with [the reexamination] history." *Id.* at 5–6. VLSI then provides a few examples of alternative circuit arrangements. *Id.* at 6. VLSI contends that Intel's proposed construction goes "far, far beyond

what the patentee actually said" by excluding "the many other possible circuit arrangements where the inductance is not 'between the power source and regulating circuitry.'" *Id.*

In its reply, Intel contends that it did not create the buck and boost converter comparison, but rather that the patentee did so:

> (1) first by presenting the boost converter depicted in Figure 1 of the '522 patent to illustrate what regulating "from a power source and an inductance" means, and (2) then by arguing that the buck converters in each of the eight prior art circuits failed to satisfy that meaning because their inductance is not connected to the power supply and is located after the regulating circuity.

ECF No. 89 at 1.

With respect to VLSI's argument that Intel's proposed construction goes too by excluding buck-boost converters, Intel contends that its proposed construction "allows the claims to be met by any type of converter—including those in a buck-boost configuration and/or that reduce output voltage—as long as the converter has an inductance connected to the power source and positioned between the power source and regulating circuitry." *Id.*

With respect to VLSI's argument that Intel's proposed construction directly contradicts the specification's description that the claimed invention may use a buck converter instead of a boost converter, Intel contends that its proposed construction is based on the patentee's reexamination statements—which post-date the specification—which thus supersede the specification's disclosures. *Id.* at 2.

With respect to VLSI's arguments regarding to the Dancy reference, Intel contends that the "reason Dancy's control signal operates switches S1 and S2 'from the power source (Vin) *alone*, not from the power source *and* the inductance' is because the inductance is located after switches S1 and S2—instead of being positioned between power source (Vin) and the regulating circuitry (S1 and S2)." *Id.* at 3 (emphasis in original). With respect to the Wei reference, Intel contends

that the patentee's distinguished Wei based on the fact that "Wei's inductance ***is not connected to a power source*** and Wei does not disclose ***regulating CVdd 'from a power source and inductance[.]***'" *Id.* (emphasis in original)  With respect to the Gutnik II reference, Intel contends that the word "but" in the patentee's reexamination statement ("Gutnik II's DC/DC converter uses the LC filter in a buck configuration, but doesn't regulate a supply voltage 'from an inductance and a power source[.]'") describes that the "the configuration of the inductance still does not meet the 'from a power source and an inductance' limitation." *Id.* at 4.  With respect to Goodman, Burd I, and Burd II, Intel contends that the patentee distinguished those references that the inductor is in the wrong place in the buck configuration.  *Id.*

With respect to VLSI's argument that there is no disavowal because there are multiple amenable interpretations to the patentee's reexamination statements, Intel contends that VLSI only addresses two (Dancy and Gutnik II) of the eight references. *Id.* at 4–5.

Finally, with respect VLSI's argument that the patentee's statements do not "exclude the many other possible circuit arrangements where the inductance is not 'between the power source and regulating circuitry,'" Intel contends that its proposed construction "does not exclude arrangements where there is an inductor on both sides of the regulating circuitry—so long as there is at least one inductance that sits between the power source and regulating circuitry." *Id.* at 5.

### c.  The Court's analysis

After reviewing the parties' arguments and considering the applicable law, the Court agrees with VLSI that the patentee's reexamination statements do not meet the "exacting" requirement needed for a "clear and unmistakable disavowal," and that the proper construction is plain-and-ordinary meaning.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("The standards for finding lexicography and disavowal are exacting.").

With respect to the Dancy reference, the Court does not find that the patentee's statements constitute a disclaimer. The Court agrees with VLSI's argument that the disputed prosecution statement appears to be directed towards the voltage regulator's control signal. The patentee argued the following about Dancy:

> [C]laim 1 recites "A power efficient integrated circuit comprising ... on-chip power supply control module operably coupled to regulate at least one supply *from a power source and an inductance* based on a power supply control signal (emphasis added)." This limitation is supported in the '522 patent by, inter alia, on-chip power supply 20, which regulates supply 58 from power source 62 (e.g. a battery) *and* inductance 60[.] Dancy's regulator ("Down Converter"), however, does not regulate at least one supply ($V_{out}$) "from a power source and an inductance" because the power supply control signal operates switches S1 and S2 from the power source ($V_{in}$) alone, not from the power source and the inductance as recited in claim 1[.]



**Figure 10: Standard Down Converter Topology.**

ECF No. 82, Ex. DX-11 at 16. Of these three sentences, the first sentence simply repeats the claim language while the second sentence describes that the specification of the patent discloses that limitation. In the third sentence, the patentee explains that Dancy does not disclose "regulat[ing] at least one supply from a power source and an inductance based on a power supply control signal" as Dancy discloses using a power supply control signal that controls switches S1 and S2 from the power source (Vin) only and not the power source <u>and</u> the inductance. The Court agrees with VLSI that this statement appears to be directed towards the power supply control signal. Furthermore, the patentee's statement does not appear to support "where the inductance is positioned between the power source and the regulating circuitry" in Intel's proposed construction.

14

In other words, the patentee's statement plainly does not recite where the inductance must be placed, let alone that it is placed between the power source and the regulating circuitry as Intel's proposed construction requires.

With respect to Wei reference, the Court does not find that the patentee's statements constitute a disclaimer. The patentee argued the following about Wei:

> [C]laim 1 recites "A power efficient integrated circuit comprising ... on-chip power supply control module operably coupled to regulate at least one supply *from a power source and an inductance* based on a power supply control signal (emphasis added)." Wei's inductance is not connected to a power source and Wei does not disclose regulating CVdd "from a power source and an inductance[.]"



*Id.* at 25–26. The Court agrees with VLSI that the last sentence does not meet the "clear and unmistakable disavowal" standard necessary for a finding of disavowal. More specifically, the Court finds that the patentee's statement "Wei's inductance is not connected to a power source and Wei does not disclose regulating CVdd "from a power source and an inductance" to simply state that the Wei does not disclose "regulating at least one supply from a power source and an inductance" because, at least according to the patentee, the inductance in Wei is not connected to a power source. *Id.* at 26. More specifically, just because an inductor is not connected to a power source, it does not necessarily follow that the inductor must be positioned between the power

source and the regulating circuitry.  As such, the Court finds that this statement does not "clearly and unmistakab[ly]" state that the inductor must be positioned between the power source and the regulating circuitry as required by Intel's proposed construction.  *Omega Eng. v. Raytek Corp.*, 334 F.3d 1314, 1324–25 (Fed. Cir. 2003) (patentee must have "unequivocally disavowed a certain meaning to obtain his patent" using "clear and unmistakable" statements).

With respect to Min, the patentee made a nearly identical statement, namely, that "Min's inductance is not connected to a power source and Min does not disclose regulating $V_{out}$ 'from a power source and an inductance.'"  ECF No. 82, Ex. DX-11 at 22.  As such, the Court likewise does not find that this statement meets the "exacting" standard necessary for a disclaimer.  *Hill-Rom Servs.,* 755 F.3d at 1371 ("The standards for finding lexicography and disavowal are exacting.").

With respect to Goodman, the patentee made a similar statement, namely, that "Goodman's 'external LC filter' is not connected to a power source and Goodman does not disclose regulating $V_{DD}/V_{A/D}$ 'from a power source and an inductance[.]'"  ECF No. 82, Ex. DX-11 at 29.  Because this statement is similar to the patentee's statement with respect to Wei and Min, the Court similarly does not find that this statement meets the "exacting" standard necessary for a disclaimer. *Hill-Rom Servs.,* 755 F.3d at 1371.  Furthermore, as compared with the patentee's statements with respect to Wei and Min, because the patentee's statement with respect to Goodman is directed to the external LC filter—and not just the inductance (L)—the Court finds that this statement is even weaker justification than the patentee's statements for Wei and Min with respect to "where the inductance is positioned between the power source and the regulating circuitry" in Intel's proposed construction.

16

The patentee made virtually identical statements with respect to Burd I and Burd II (*e.g.*, "Burd I's DC/DC converter is implemented with a regulator and an external inductor and capacitor, and Burd I does not disclose regulating $V_{DD}$ 'from a power source and an inductance[.]'  Burd I's DC/DC converter in fact uses the external LC filter in a synchronous buck configuration[.]"), both of which are very similar to the statements the patentee made with respect to Wei, Min, and Goodman.  ECF No. 82, DX-11 at 32, 35–36.  Accordingly, the Court similarly does not find that this statement meets the "exacting" standard necessary for a prosecution disclaimer.  *Hill-Rom Servs.,* 755 F.3d at 1371.  Furthermore, as was the case for Goodman, because the patentee's statements with respect to Burd I and Burd II are directed to the external LC filter—and not just the inductance (L)—the Court finds that this statement does not provide any justification to require that "the inductance is positioned between the power source and the regulating circuitry" as recited in Intel's proposed construction.

With respect to Gutnik I, the Court does not find that the patentee's statements constitute a disclaimer.  The patentee argued the following about Gutnik I:

> [C]laim 1 recites "A power efficient integrated circuit comprising ... on-chip power supply control module operably coupled to regulate at least one supply from a power source and an inductance based on a power supply control signal (emphasis added)."  Gutnik I discloses a buck converter using an inductor and capacitor, and Gutnik I does not disclose regulating V out "from a power source and an inductance[.]"



Fig. 8.  Simplified buck converter schematic.

ECF No. 82, DX-11 at 39.  While the patentee describes Gutnik I as disclosing "a buck converter using an inductor and capacitor," this statement is similar to those in Wei, Min, and Goodman in that it does not "clearly and unmistakab[ly]" state that the inductor must be positioned between the power source and the regulating circuitry as required by Intel's proposed construction.  *Omega Eng.*, 334 F.3d at 1324–25.  Because the statement is also similar to the statement in Goodman in that both were directed to an indictor and capacitor (LC)—and not just the inductance (L)—the patentee's statement with respect to Gutnik I also does not provide any additional justification on how to limit the position of just an inductor (*i.e.*, without a capacitor).

With respect to Gutnik II, the Court agrees that the patentee's statement is somewhat more ambiguous than the patentee's statements regarding Gutnik I and, to a lesser degree, the patentee's statements regarding Wei, Min, and Goodman.  More specifically, the patentee stated that "Gutnik II's DC/DC converter uses the LC filter in a buck configuration, but doesn't regulate a supply voltage 'from an inductance and a power source.'"  ECF No, 82, Ex. DX-11 at 44.  While this statement is similar to the patentee's statement with respect to Gutnik I, the patentee's use of the word "but" with respect to Gutnik II introduces some ambiguity as it could imply that the patentee believed that Gutnik II's DC/DC a buck converter could fall within this claim scope.  Based on this understanding, the Court does not believe that the patentee's statement disclaimed buck voltage regulators during reexamination and that the claimed invention covers boost voltage regulators only.

Based on reasons the Court provided above with respect to Dancy, Wei, Min, Goodman, Burd I, Burd II, Gutnik I, and Gutnik II, the Court concludes that Intel has not carried its "exacting" burden needed to show that the patentee made a "clear and unmistakable disavowal" during reexamination.  Concomitantly, because Intel bases its proposed construction on the premise that

the patentee disavowed claim scope during prosecution, the Court declines to adopt Intel's proposed construction.

In addition, the Court agrees with VLSI that passages from the specification indicate that Intel's proposed construction goes too far in that there are only two types of voltage regulators—buck and boost—and that the patentee disclaimed the former in order to cover the latter only. For example, in addition to boost and buck converters, the specification expressly describes that a "combination of a buck and boost converter may be used." '522 Patent at 6:55. Furthermore, this passage expressly describes that "a buck converter may be instead of a boost converter." *Id.* at 6:54. While these specification snippets preceded the patentee's reexamination statements, the Court finds that the specification further reinforces the Court's conclusion that the patentee did not make a prosecution disclaimer during reexamination.

With respect to the proper construction of this term, the general rule is that claim terms are generally given their plain-and-ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc*); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds*, 575 U.S. 959, 959 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (internal quotation omitted). The "only two exceptions to [the] general rule" that claim terms are construed according to their plain-and-ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution. *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

Because Intel does not contend lexicography and because the patentee did not make a prosecution disclaimer, the Court finds that the proper construction for this term is plain-and-ordinary meaning.

### 2. The Court's jury instruction on the "regulating" claim construction was not unfair because it was consistent with its *Markman* ruling

VLSI contends this Court committed prejudicial error when it denied VLSI's request to provide the jury a different claim construction than the construction granted in the *Markman* Order—VLSI's own proposed construction. *See* ECF No. 597, p. 1–3; ECF No. 101, p. 1. The claim term at issue is from claims 9 and 16 of the '522 Patent, and they state: "regulate/regulating at least one supply from a power source and an inductance." A party who seeks Rule 59 relief grounded on "erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, (3) the errors had prejudicial effect, and (4) it requested alternative instructions that would have remedied the error." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1360 (Fed. Cir. 2004).

VLSI cites *O2 Micro Intern. Ltd. v. Beyond Innovation Tech. Co., Ltd.,* 521 F.3d 1351 (Fed. Cir. 2008), and argues that, although the jury was given the construction VLSI originally advocated for, the instruction of "plain and ordinary meaning" was "inadequate" and "did not resolve the parties dispute." *Id.* The Court disagrees and holds VLSI waived its argument to provide the jury a separate construction when it successfully advocated for a construction of "plain and ordinary meaning" during the *Markman* hearing below. *See Broadcom Corp. v. Qualcomm Inc.,* 543 F.3d 683, 694 (Fed. Cir. 2008); ECF No. 81, p. 5 ("This Term Does Not Require Construction"). Further, the Court finds that the issue here is distinguishable from *O2 Micro* because that case and others cited by VLSI pertained to parties who proposed their own

constructions, but the trial court adversely granted "plain and ordinary meaning" constructions. *See O2 Micro*, 521 F.3d at 1360.

First, VLSI attempts to use the Court's language from the *Markman* hearing transcript to say that it "construed the limitation 'to allow both a boost and buck converter'" as a ground for why the jury instructions should have included that language. ECF No. 597, p 2. VLSI argues the Court was "obligated to give that construction to the jury." *Omega Patents v. CalAmp Corp*., 920 F.3d 1337, 1347 (Fed. Cir. 2019); ECF No. 619, p. 1. This is plainly incorrect. The Court said during the hearing, "The Court is going to find that there was no disavowal. . . . [W]e find that it would allow both a boost and a buck converter; therefore, the *claim construction for the first term is going to be plain and ordinary meaning*." ECF No. 99, 50:22–51:2 (emphasis added). If the Court intended to expound further on the scope of the "plain and ordinary meaning" it would have said so unequivocally, and such a construction would have appeared in the *Markman* Order. The language prior to the ruling was mere reasoning as to Intel's unsuccessful disavowal argument. The Court was obligated to give the jury its construction, and that construction was "plain and ordinary meaning." ECF. No. 101, p. 1. The *Markman* hearing was "an explanation to the parties of the reasoning behind its claim construction. The court's analysis need not be part of the jury instructions." *MercExchange, LLC v. eBay, Inc*., 401 F.3d 1323, 1329 (Fed. Cir. 2005), *vacated in part on other grounds by eBay Inc. v. MercExchange*, LLC, 547 U.S. 388 (2006).

By virtue of the arguments VLSI presented during the *Markman* hearing, this Court finds VLSI waived its current objection to the jury instruction of "plain and ordinary meaning," even if VLSI made "a proper and timely objection" to those instructions at trial. ECF No. 81, p. 5; *Eli Lilly* 376 F.3d at 1360. "[A] party may not introduce new claim construction arguments . . . or alter the scope of the claim construction positions it took below." *Broadcom*, 543 F.3d 683, 694 (Fed.

Cir. 2008) (citation omitted); *see also Function Media, LLC v. Google, Inc.,* 708 F.3d 1310, 1322 (Fed. Cir. 2013) ("[A party] may not object to the court's decision to instruct the jury to apply the claim construction that [the party] itself proposed."). VLSI cannot argue that the term "does not require construction" during *Markman* proceedings and succeed there, but then, only after the jury heard evidence at trial, ask for a different construction. *See* ECF No. 81, p. 5.

Further, *O2 Micro* is readily distinguishable from the issues here. In *O2 Micro*, the issue of "inadequate" claim construction was brought by the party who proposed a construction at the *Markman* stage but was denied, and the term was given plain and ordinary meaning. *O2 Micro*, 521 F.3d at 1357, 1360. "While *O2 Micro* . . . permits a remand for further claim construction, it does not require one." *Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc*., 554 F.3d 1010, 1019, n.4 (Fed. Cir. 2009). VLSI argues, according to testimony by Intel's expert witness, that there was "clearly 'an actual dispute regarding the proper [claim] scope.'" ECF No. 619, p 2. However, the Court is not persuaded on this account of the trial record. Intel's expert testified that both "buck" and "boost" converters could be allowed by the claim's scope. 4/15 Tr. [Apsel] 1066:19–1067:1 ("Q. . . . If a device or a chip meets all the other limitations of the claim but uses a buck converter instead of a boost converter, it would still infringe the claims, correct? Yes or no. A. Yes. If it meets . . . all the limitations of the claim."). VLSI argues that this was "doublespeak." ECF No. 619, p. 2. Unfortunately, "[n]early every patent case will involve some amount of "word games." *Function Media, L.L.C. v. Google, Inc.,* 708 F.3d 1310, 1326 (Fed. Cir. 2013). The Court holds that the instruction given to the jury did not amount to an unfair error which warrants a new trial. *See Transworld*, 773 F.2d at 613.

### 3. Intel did not argue a rejected claim construction for the "regulating" term

VLSI contends a new trial is warranted because Intel argued a construction of the "regulating" term discussed above to the jury, which was allegedly inconsistent with the construction granted at Markman. ECF No. 597, p. 4–6. Specifically, VLSI argues that Intel presented to the jury their same proposed *Markman* construction that the Court rejected previously. *Id*. The Court disagrees, and the record demonstrates otherwise.

As discussed above, Intel unsuccessfully advocated a construction for the "regulating" term of the '522 Patent, which would have excluded the class of "buck" regulators through a disclaimer theory. ECF No. 82, p. 3. Again, the term states, "regulate/regulating at least one supply from a power source and an inductance." *Id.* The term's plain and ordinary meaning was granted instead. ECF No. 101, p. 1. VLSI complains that Intel argued at trial that the accused FIVR products do not "regulate from . . . an inductance" as the claim term requires, but that they "regulate . . . into the inductors." ECF No. 597, p. 5. VLSI's issue with this argument is that it "reassert[ed] to the jury constructions that the court ha[d] already . . . rejected." *Id.* at p. 6, (quoting *Fenner Inv., Ltd. v. Microsoft Corp.*, 632 F. Supp. 2d 627, 638 (E.D. Tex. 2009)). At the *Markman* stage, the Court rejected Intel's construction which would have excluded a class of regulators with a different configuration than the plain and ordinary meaning of the claim term. ECF No. 82, p. 5. At trial, Intel did not argue that the claim requires a boost converter. *See* 4/15 Tr. [Apsel] 1066:19–1067:1. Instead, Intel argued that its products do not do what the claims require—they do not "regulate from . . . an inductance." 4/15 Tr. [Apsel] 1110:18–1111:9.

The Court finds that Intel's arguments at trial did not amount to a reassertion of a failed claim construction argument. The trial record shows that the non-infringement evidence presented by Intel was appropriate and consistent with the claim term's "plain and ordinary meaning." Thus,

Intel has not shown it is "reasonably clear that prejudicial error . . . crept into the record or that substantial justice has not been done." 977 F.3d at 417.

### 4.    VLSI waived its assertion that Intel improperly argued claim construction for the "processing requirements" term by not objecting at trial

Next, VLSI argues as "a separate and independently sufficient ground for a new trial" that Intel improperly argued claim construction to the jury for the "processing requirements" term. ECF No. 597, p. 6–9. This term, from the '522 Patent, states: "produce/producing the system clock control signal and the power supply control signal based on . . . processing requirements associated with processing at least a portion of an application." The parties agreed that the term needed no construction and it was given its plain and ordinary meaning. No. 597, p. 6. The Court granted VLSI's Motion *in limine* No. 5.3 ("MIL 5.3") request which stated, "if the Court did not construe a term, the Court should preclude Intel's witnesses from construing the claim terms or from offering any interpretation other than the ordinary meaning from the perspective of a person of ordinary skill in the art at the time the inventions were made." *See* ECF No. 582, p. 7. However, because VLSI did not contemporaneously object to Intel's allegedly improper claim construction arguments at trial, the Court finds that VLSI waived the right to seek a new trial on this ground.

"[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *TVIIM, LLC v. McAfee, Inc*., 851 F.3d 1356, 1363 (Fed. Cir. 2017). Further, "objection is required to preserve error when an opponent, or the court itself, violates a motion *in limine* that was granted. . . . The courts cannot adopt a rule that would permit counsel to sit silently when an error is committed at trial with the hope that they will get a new trial because of that error if they lose." *Collins v. Wayne Corp*., 621 F.2d 777, 785–86 (5th Cir. 1980).[2] VLSI

---

[2] This ruling was superseded by *Mathis v. Exxon Corp*., 302 F.3d 448, 459 (5th Cir. 2002), where the Court noted "[t]he 2000 amendment to rule 103(a) changed the law that had prevailed in this

did not propose any construction or present any issues concerning the "processing requirements" claim term until now. While VLSI's boilerplate MIL 5.3 sought to exclude Intel's witnesses from construing any terms not given a *Markman* construction, VLSI also had full notice of Intel's non-infringement arguments as stated in Dr. Aspel's rebuttal expert report before trial. However, the record shows that VLSI never objected to arguments or testimony about this claim term, and VLSI does not say it did. Therefore, VLSI waived any claim of error or prejudice to the jury because it failed to contemporaneously object or attempt to enforce compliance with MIL 5.3.

"Motions *in limine* are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial." *Collins*, 621 F.2d at 784 (5th Cir. 1980). In this case, VLSI's MIL was purely restating black letter law. *See Cordis Corp. v. Boston Sci*., 561 F.3d 1319, 1337 (Fed. Cir. 2009) ("[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'") (quoting *CytoLogix Corp. v. Ventana Med. Sys*., 424 F.3d 1168, 1172–73 (Fed. Cir. 2005))). Even in *CytoLogix,* the Court held "there is no ground for reversal since there was no objection to the expert testimony as to claim construction." *CytoLogix,* 424 F.3d at 1173.

The generality of VLSI's MIL 5.3, which simply restates Federal Circuit precedent, made its enforcement impractical without objections from VLSI. Even further, VLSI completed a cross-examination of the witness who it alleges improperly gave an incorrect claim construction and

---

circuit. . . . Before the amendment, we required an objection at trial to preserve the error." However, this change referred to objections concerning evidence in previously **denied** motions *in limine*. The Advisory Committee Notes for the 2000 amendment offer that "nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered. . . . *if the opposing party violates the terms of the initial ruling, objection must be made when the evidence is offered to preserve the claim of error* for appeal." Fed. R. Evid. 103 (citing *United States Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990)) (emphasis added).

invited its own expert to opine on Intel's arguments. 4/15 Tr. [Apsel] at 1080:22–1086:10; 4/13 Tr. [Brogioli] at 398:15–3991:1; 4/19 Tr. [Brogioli] at 1489:17–1491:1.

Finally, VLSI cites *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 70 (Fed. Cir. 2012), where the Court applied 5th Circuit law stating "ostensible waiver . . . does not preclude the district court from exercising its discretion to consider [an] issue." 694 F.3d at 70. However, The Federal Circuit was applying the ruling in *Garriott v. NCsoft Corp.*, 661 F.3d 243 (5th Cir. 2011) where the 5th Circuit found "that an otherwise waived argument made in a motion for a new trial was properly addressed and preserved when the district court exercised its discretion to consider the issue in its opinion denying the motion." 694 F.3d at 70. Accordingly, VLSI's request for a new trial on these grounds was waived because it failed to object at trial, and this Court will not exercise its discretion to consider a waived argument now.

## B. The '187 Patent

### 1. VLSI also waived claims of error for improper jury arguments concerning the "substantially reached a steady-state" and "when a power source is operably coupled" limitations

VLSI also contends Intel improperly argued claim construction to the jury with respect to the "substantially reached a steady-state" and the "when a power source is operably coupled" limitations. These limitations, from U.S. Patent No. 6,633,187 ("'187 Patent") claims 1 and 13, state: "when the at least one supply has substantially reached a steady-state condition, enable/enabling functionality of the stand-alone IC" and establish/establishing an idle state that holds at least a portion of the stand-alone IC in a reset condition when a power source is operably coupled to the stand-alone IC." These claims were not construed by the Court, nor did either party proffer a claim construction for either limitation.

Similar to the "processing requirements" limitation discussed above, VLSI did not object to any arguments or testimony put forth by Intel or their expert witnesses with respect to these limitations. Much like the "processing requirements" limitation, VLSI cross-examined Intel's expert witness, Dr. Leeb, on these very arguments, and VLSI's own expert witness, Dr. Reinman, addressed them as well. *See* 4/19 Tr. [Leeb] 1238:3–1241:24, 1254:2–1258:4; 4/12 Tr. [Reinman] 242:24–243:23, 325:1–7; 4/19 Tr. [Reinman] 1382:12–1394:21.

Intel's arguments did not stray from those presented in its expert witness' rebuttal report— received months in advance of trial—so VLSI had ample opportunity to make objections during or before the trial.  VLSI again points to MIL 5.3 to show it did not waive any argument about claim constructions. However, for the same reasons as stated above, the alleged improper claim construction arguments VLSI makes in favor of a new trial for the '187 Patent were waived because VLSI failed to object at any time to these arguments.

## A.  The record shows Intel did not exploit improperly withhold discovery

VLSI alleges, as a ground for a new trial under Federal Rule of Civil Procedure 60(b)(3), that Intel withheld "highly relevant discovery" materials and that Intel exploited this to undermine VLSI's expert witness' credibility. ECF No. 597, p. 12–16. "One who asserts that an adverse party has obtained a verdict through fraud, misrepresentation or other misconduct has the burden of proving the assertion by clear and convincing evidence." *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1339 (5th Cir. 1978) (citation omitted). Principally, VLSI contends that "Intel falsely told VLSI it did not have" a specific simulator tool that VLSI's expert witness would use for analysis of technical benefits. ECF No. 597, p. 13. VLSI also argues the Court committed error when it denied a request for a curative jury instruction concerning "Intel's discovery abuses." *Id.* at 14–15. The Court disagrees and finds that VLSI has not met its "heavy burden" of proving that Intel committed

any misconduct during discovery or at trial to warrant a new trial. *See In re DePuy Orthopaedics*, 888 F.3d at 790.

Contrary to VLSI's allegations of misrepresentation, Intel was consistent throughout the discovery process that it "conducted a reasonable search for Fox2 software that can be used with the accused products and have not located any that have not been produced." ECF No 597, p. 15. The trial conduct that VSLI takes issue with concerns two witness interactions: first, Intel's questioning of its own witness, Mr. Borkowski, and second, Intel's cross-examination of VLSI's expert witness, Dr. Annavaram. VLSI's only showing that Intel knew of the specific simulator for servers' existence is from this exchange between Intel and Mr. Borkowski:

> Q. Is the Fox2 product for server processors the same as the Fox2
> product for client processor servers?
> A. No. They're totally different.
> Q. Would you use Fox2 for servers to test clients or vice versa use
> the Fox2 for clients to test servers?
> A. No. You couldn't.
> Q. If someone did that, would you say that was the right thing to do
> or the wrong thing to do?
> A. It's the wrong thing to do. I don't think it would even run.

Trial Tr. [Borkowski] 904:24–905:8.

While VLSI characterizes this interaction as proof that Intel misrepresented its position about this simulator during discover, the Court disagrees. The trial testimony above was merely Intel's attempt to explain to the jury that different simulators have different intended uses. This testimony does not remotely show "by clear and convincing evidence" that Intel obtained their verdict "through fraud, misrepresentation or other misconduct." *Rozier,* 573 F.2d at 1339. Rather, Intel represented that it conducted a reasonable search but could not find the simulator requested, and the Court is not convinced the testimony above demonstrates that "Intel falsely told VLSI it did not have" it. *See* ECF No. 597, p. 13.

28

Likewise, the Court finds Intel's cross-examination of Dr. Annavaram was not prejudicial and did not amount to misconduct by "exploiting improperly withheld discovery." *See Id.* at 12. In fact, the testimony VLSI points to was concerning Dr. Annavaram's use of the "Whiskey Lake" simulator for his analysis—an unaccused product. *Id.* at 13; Trial Tr. [Annavaram] 552:24–553:10. Though VLSI characterizes this as an attempt to "undermine[] his and VLSI's credibility," Dr. Annavaram himself defended the use of the unaccused Whiskey Lake for analysis and emphasized that there are advantages to using it. *Id.* at 553:5-8. Thus, the Court cannot find "extreme resulting prejudice to VLSI" from the testimony elicited at trial and the surrounding circumstances to warrant a new trial. ECF No. 597, p.15

Next, VLSI takes issue with Intel's sustained objections to testimony about discovery issues. *Id.* at 14. VLSI contends, "[h]ad Dr. Annavaram been allowed to answer, he would have provided key context by explaining what tools Intel did and did not produce. . . ." *Id.* The Court correctly sustained that objection, precisely for the reason Intel explains in their Opposition Brief: that "Dr. Annavaram could not properly offer opinions regarding discovery disputes—a subject about which he has neither expertise nor personal knowledge." ECF No. 609, p. 15. Dr. Annavaram had ample opportunity to explain that he was "relying only on [a] limited set of tools," which would have been within his expertise and not subject to Intel's Motion *in limine* 16 ("Exclude References To Discovery Disputes"), but he did not.

Finally, VLSI asserts the Court erred when it denied VLSI's request for a "curative jury instruction" stating "either (i) that Intel withheld Fox2 simulators for accused products during discovery or (ii) that the jury may assume Dr. Annavaram's analysis was representative of all the Accused Products." ECF No. 597, p. 14–15. In support of its new trial request, VLSI says, "the Fifth Circuit applies a less-rigorous standard, requiring only that the sanction be '[j]ust and [f]air,'

that it have a 'substantial relationship' to the facts sought to be established by the discovery, and that it meet Rule 37's goals of punishment and deterrence." ECF No. 619, p. 12 (citing *Alexsam, Inc. v. IDT Corp.,* 715 F.3d 1336, 1343 (Fed. Cir. 2013). However, that is the standard for when "courts . . . respond to and deal with parties which have disobeyed discovery orders" at trial—not for Rule 59 or Rule 60 motions. *See Chilcutt v. United States*, 4 F.3d 1313, 1319–20 (5th Cir. 1993). This Court never found any discovery orders were disobeyed. Further, the jury did hear from VLSI about its alleged discovery problems. *See* 4/20 Tr. [VLSI Closing] 1698:19–22 *(* "Intel did not provide access to the server Fox2 tools.... It was not available to the experts for VLSI.") No curative instruction was needed, and the Court holds that omitting the requested instructions from the jury charge did not unfairly prejudice VLSI.

### B. Improper closing arguments

VLSI's last arguments supporting its motion for a new trial depend on this Court finding Intel's closing arguments were "so conducive to prejudicing the jury's verdict that it substantially affected the total fairness of the trial." *Edwards v. Sears, Roebuck & Co*., 512 F.2d 276, 283–84 (5th Cir. 1975). First, the court holds that VLSI waived these arguments now by not objecting during trial. Second, the Court is not persuaded that Intel's closing arguments prejudiced the jury as to make the trial unfair.

"A district court may order a new trial if improper closing argument irreparably prejudices a jury verdict or if a jury fails to follow instructions." *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988.). This Court has great "respect for the jury as an institution" and is always "concern[ed] that the party who persuaded the jury should not be stripped unfairly of a favorable decision." *Id.* District courts should "examine the propriety of closing argument by reviewing the entire argument within the context of the court's rulings on objections,

the jury charge, and any corrective measures applied . . . ." *Id.* However, failure to object during trial results in waiver. *See, e.g., id.*; *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012) (movant waived objection to statements in closing argument because he "raised no objection to the statements at trial"). Such waiver may be disregarded only when the closing arguments "affect the substantial rights of the parties." *Edwards,* 512 F.2d at 286.

As a preliminary matter, the Court advised the jury explicitly and repeatedly: "After the remainder of these instructions, you will hear closing arguments from the attorneys. Statements and arguments of the attorneys, I remind you, are not evidence. *They are not instructions on the law.*" 4/20 Tr. 1563:15–18 (emphasis added). VLSI contends that Intel's statement during closing arguments ("It is possible to infringe a patent without knowing about it. It is possible to infringe a patent without copying it. But that's just a theoretical possibility for lawyers") amounted to an invitation to the jury to disregard that direct infringement does not have a knowledge requirement. ECF No 597, p. 17. On this issue, the Court finds that Intel neither committed misconduct in its closing arguments nor was VLSI prejudiced by these remarks to warrant a new trial.

Next, VLSI alleges that Intel cited its own patents to "intimate the jury should find no infringement" which was improper because "[t]he existence of one's own patent does not constitute a defense to infringement." *Id.*; *Bio-Tech. Gen. Corp. v. Genentech, Inc*., 80 F.3d 1553, 1559 (Fed. Cir. 1996). While it is true that the existence of one's own patents does not constitute a defense, the record demonstrates Intel made no such defensive argument. Rather, Intel referred to its own patents to demonstrate the expertise of its own witnesses who "actually did the work to invent and design and make the Intel products that that are accused of infringement." 4/20 Tr. [Intel Closing] 1636:15–21. These closing statements were not improper such that they warrant a new trial. The Court is also of the opinion that Intel's remarks about the Clark patent were

consistent with Intel's invalidity defense and similarly does not warrant a new trial. *See, e.g., Id.* at 1656:9–1658:6 ("What you learned was the Patent Office decided to take a second look at the '522 patent, a second look to see if they had gotten it right. . . . During the process, the Patent Office itself learned about a prior art patent . . . . The new prior art was an Intel patent called Clark.").

VLSI also alleges that "Intel invited the jury (a) to speculate that [prior owners of the asserted patents] 'never sued Intel' because they believed 'the accused products' do not infringe 'these patents,' and (b) to find non-infringement based on that speculation." ECF No. 597, p. 18–19. The Court disagrees. In response to VLSI's *in limine* motion about such hypothetical arguments, the Court held "[i]t is a fact and you can put into evidence" but "you don't get to imply that there's not infringement." 4/6/2021 Hr'g Tr. 45:6–12; *see also* ECF No. 582, p. 2 ("Intel cannot imply there is no infringement because of predecessor owners' non-assertion of the patents against Intel."). During closing arguments, Intel's counsel stated:

> Freescale never sued Intel. NXP never sued Intel. These companies, big companies with lots of lawyers, lots of licensing folk, lots of engineers, owned these patents for six full years while Intel was selling the accused products. None of them ever sued. Only VLSI.

4/20 Trial Tr. [Intel Closing] 1678:13–17.

These statements were made without objection. These facts were on the record already, and the quotation above did not cross the line of implying that the previous owners' inaction showed they did not believe the asserted patents infringed. Intel also supports these remarks by stating it was rebutting VSLI's argument that it "had no choice to bring this case to court." 4/20 Tr. [Intel Closing] 1677:21–1678:17. The Court does not find these remarks were either improper or prejudicial.

Penultimately, VLSI takes issue with Intel's closing arguments concerning damages. Counsel for Intel stated that "[i]f Intel were to pay royalties on two patents of the thousands of patents that could apply to this chip for a product selling for $100, it would be out of business." *Id.* at 1669:3–13. This statement potentially conflicted with a prior granted Motion *in limine* concerning suggestions about the possibility of hurting Intel's business if it was found liable. ECF 582, p. 2. However, VLSI neither objected during trial nor did it request any curative measure. Now, VLSI claims this statement made at trial was so prejudicial as to warrant a new trial, but they make no argument as to why this was relevant to the jury's verdict on infringement as opposed to a potential damages award. Intel also argues this statement "violated the Court's ruling on VLSI MIL No. 1.6 barring hypothetical royalty stacking arguments." ECF No. 597, p. 19; *see* ECF No. 582, p. 1. VLSI did not object during trial. The Court cannot find that such a statement was anything other than a response to VLSI's damages demand, and the Court is unpersuaded that such a statement amounted to an "abstract recitations of royalty stacking theory." Most importantly, VLSI waived this argument by failing to object during trial. Therefore, VLSI's Motion for a New Trial on this ground is denied.

VLSI's final contention with Intel's closing argument is concerning the "cold reset" feature of Intel's product." ECF No. 597, p. 20. VLSI elected not to argue its theory of cold reset infringement at trial. *Id.* During closing arguments, Intel referred to this feature when it stated, "Now, this is our version of power reset. It does not infringe the '187 patent. Even VLSI says it doesn't infringe, and Dr. Reinman offered no opinion on it." 4/20 Trial Tr. [Intel Closing] 1648:17–1649:6. Other than conclusory arguments like that statement was "grossly improper and clearly prejudicial," VLSI makes no effort to show how talking about an unaccused feature might have been so prejudicial. VLSI also did not object to these statements at trial, so this argument was

waived. Each of VLSI's arguments for a new trial based on allegedly improper closing statements are unavailing to the Court or waived by inaction during trial. In viewing "the propriety of closing argument by reviewing the entire argument within the context of the court's rulings on objections, the jury charge, and any corrective measures applied," VLSI's motion is denied. *See Nissho-Iwai,* 848 F.2d at 619.

## IV.    CONCLUSION

For the reasons stated above, Plaintiff VLSI Technology LLC's Motion for a New Trial under Federal Rules of Civil Procedure 59 and 60(b)(3) is hereby **DENIED.**

**SIGNED** this 26th day of September 2024.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE